IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Peggy A. Blizzard,                                    Case No. 3:09CV1643

        Plaintiff

    v.                                              ORDER

Marion Technical College, *et al.*,

        Defendants


This is an employment discrimination case. Defendant Marion Technical College (MTC) fired fifty-seven-year-old plaintiff Peggy A. Blizzard from her position as an Accounts Payable Clerk in 2008. Blizzard filed suit against MTC and her supervisor, Jeffrey Nutter, under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 626, and Ohio Revised Code (ORC) § 4112.02. Blizzard claims MTC fired her due to her age and in retaliation to her protected activities. She also asserts state law claims for intentional infliction of emotional distress and breach of contract.

Jurisdiction is proper under 28 U.S.C. 1331.

The defendants have filed a motion for summary judgment on all claims. [Doc. 42]. For the following reasons, the motion shall be granted.

## Background

### 1. Employment History

Blizzard began working for MTC in 1991 as a student worker. In 1992, she accepted a part-time Associate Account Clerk position. MTC promoted her to Accounts Payable Clerk in the business office in 1996, a part-time position she held until her termination in April, 2008.

Defendant Jeffrey Nutter became Blizzard's supervisor when MTC hired him in the position of Controller in 2001. Nutter supervised at least three other employees in the business office, Jean Thomas (formerly Jean Gillespie), Betty MacNail and Dwight Heisel.

As part of his duties supervising employees in the business office, Nutter provided yearly evaluations of the employees' job performance. Nutter's evaluations of Blizzard's work performance from 2001–2005 indicated she generally "met expectations" and in some categories "exceeded expectations."

Blizzard is seventeen years older than Nutter. MacNail is fifteen years older than Nutter. Heisel is ten years older than Nutter. Thomas, like Nutter, is in her forties.

Heisel found that Nutter treated Thomas, the youngest of the employee under Nutter's supervision, "with a degree of tolerance," whereas he "was much more distant" with himself and Blizzard. [Doc. 34, at 11]. Heisel left the business office for another position at MTC in 2006. He testified in deposition that he was glad to be out of Nutter's chain of command as they "had a difficult working relationship." *Id.* He felt Nutter "treated [him] with an air of superiority, condescendingly." *Id.*

2

Blizzard felt that Nutter spoke to her with hatred. Another MTC employee, Linda King, observed that Nutter and Blizzard did not see eye-to-eye, and that their interactions frequently amounted to "a cold-shoulder type of kind of just ignoring each other." [Doc. 31, at 23].

## 2. Implementation of New Software

In 2005 MTC began installing new software on its campus. Nutter and Joy Moore, MTC's Director of Management Information Systems, lead the activity.  Business office employees became part of the "Accounting Core Team" for implementation of the new software program, and between March and September, 2006, the team scheduled at least thirteen meetings to orient employees to the new software.

Nutter found Blizzard to be resistant to the changeover to the new software. Moore believed that Blizzard "had some hesitancy but . . . was striving to meet the goals." [Doc. 66, at 18]. Moore did not directly supervise Blizzard, but she attended the same training sessions and would assist Blizzard when she encountered a problem using the new software. Moore explained, "I think we all have our own learning curve so hers might have been a little bit slower but she was picking up on things." [Doc. 66, at 18].

Blizzard made errors using the new system, including incorrectly inputting vendor information. She struggled with the combined demands of training and completing her regular work. Friction developed between Blizzard and Nutter, as Nutter wanted Blizzard to work additional hours or adjust her schedule to perform her regular job duties while learning the new software.

## 3. May 25, 2006 Email and Blizzard's Yearly Appraisal

On May 25, 2006, Blizzard told Nutter she could not work the following Friday, which was her normal day off. That evening, Blizzard sent an email complaining about her work hours to MTC

3

President Richard Bryson, copying Bryson's assistant and MTC's Civil Rights Compliance Officer Teresa Parker and MTC's Director of Human Resources and Nutter's supervisor Dan Hauenstein. She did not copy Nutter on the email.

In the email, Blizzard announced, "I am very upset with Jeff Nutter." Blizzard stated she felt singled out, that "[n]o one else in this office is working extra hours," and that "[n]o additional help has been offered in our office." [Doc. 41-17]. She wrote, "I'm tired of getting chewed on in this office and I'm treated unfairly and differently from others in this office. Others in this office has [*sic*] not been required to work extra hours so why am I being picked on and then harassed?" *Id.*

President Bryson did not respond to the email. He expected that Doug Boyer, Vice President of Financial and Administrative Services, would respond, as the business office and human resources are both his areas of responsibility. [Doc. 44, at 23].

Hauenstein forwarded the email to Boyer and Nutter. Both Nutter and Hauenstein expressed frustration that Blizzard sent the email to Bryson, Parker and Hauenstein rather than addressing her problems directly with Nutter.

On June 7, 2006, Blizzard received her performance evaluation from the previous year. Nutter's appraisal of Blizzard's performance was not good. He rated Blizzard "below expectations" in several categories. Before giving her the evaluation, Nutter reviewed his evaluation with Boyer and Hauenstein, who provided comments on the draft.

Nutter held Blizzard's evaluation review meeting in Hauenstein's office. Hauenstein attended the evaluation, and Blizzard requested Deb Langdon also attend. Langdon was co-chair of the support staff group which functioned in some ways as a union for MTC staff.

4

The meeting lasted about an hour. Both Blizzard and Nutter were emotional and frustrated during the meeting.

Blizzard contested every incident forming the basis for a "below expectations" rating. She submitted a response to the appraisal on June 16, 2006, and requested it be placed in her personnel file. In the response, she challenged the negative evaluations and suggested that Nutter's appraisal reflected their personal conflict rather than her abilities. [Doc. 41-5].

Blizzard believed Nutter gave her the poor evaluation in retaliation for the email. Nutter denies being angry and states he was simply disappointed she did not come to him first. Nutter's contemporaneous notes indicate he believed the email "was inappropriate and unprofessional. Should have discussed with me and Doug [Boyer]." [Doc. 41-82].

Sometime after sending the email, Blizzard complained to Civil Rights Compliance Officer Parker about her interactions with Nutter. Parker testified in deposition that Blizzard never made a complaint of discrimination, but rather complained about Nutter being mean. Parker advised Blizzard to speak to Hauenstein, Nutter's supervisor. Blizzard went to Hauenstein shortly after the June, 2006, appraisal.

According to Blizzard, Hauenstein told her, "If you think you're going to get any sympathy, you're not going to find any here." [Doc. 24-3, at 86–87]. Blizzard states that when she told Hauenstein that "Mr. Nutter was treating me hateful, [emotionally] pushing and shoving me around in the office," Hauenstein told her, "if you don't like what's going on, find another job." *Id.*

Blizzard told Hauenstein about the difficulties she had working with Nutter. Blizzard explained that she had rearranged her schedule because of the training meetings and that Nutter was "hateful" to her, and would "start chewing on" her and "nit-picking." *Id.* Hauenstein asked if Nutter

5

had actually denied her a vacation request, and Blizzard admitted he had not. Hauenstein offered her a position that would be available in cleaning or maintenance at less pay, but Blizzard was uninterested. *Id.*

### 4. Nutter's Treatment of Others in the Business Office

Blizzard felt Nutter continued to pick on her, especially after she sent her email. She observed that Thomas, the younger employee in the business office, frequently socialized with delivery drivers, friends and family in the office. Thomas also talked on her cell phone and played games on her computer at work. Nutter testified that he did informally reprimand Thomas for socializing, but did not change her behavior.

Thomas had Nutter's permission to do homework for her classes while at work. MacNail stated in an affidavit that she frequently played solitaire on her computer when there were no students in the office.

Blizzard saw Thomas taking breaks for two hours or more, although Nutter and MacNail never observed Thomas unaccountably absent from the office for more than an hour.

Thomas received more training on the new computer system than Blizzard did. Thomas held a different job title than Blizzard, and defendants argue that Thomas received more training because her job required her to use more of the programs than Blizzard. Blizzard believes she and Thomas performed mainly similar tasks.

From December 17 to 20, 2007, Nutter allowed Thomas to work "Summer hours," which meant that on Friday, she worked from 8 a.m. to 4 p.m. rather than from 8 a.m. to 5 p.m. Blizzard was not permitted to work Summer hours and instead worked her normal shift from 10 a.m. to 6 p.m. Monday through Thursday.

Thomas took vacation when training meetings were scheduled. Nutter reprimanded Blizzard for scheduling doctor's appointments before consulting her electronic calendar, and Blizzard thereafter avoided scheduling medical appointments and time off during training meetings. Blizzard did take time off after the incident, but took care not to request time scheduled for training meetings.

Nutter once denied Blizzard's request to leave the office for a support staff meeting. Nutter testified that he needed Blizzard to stay in the office because Thomas and MacNail had already requested the time off and he had a meeting scheduled during that time.

### 5. Continuing Friction Between Nutter and Blizzard

After the June 2006, evaluation Nutter and Blizzard continued to have problems working together. *See* [Doc. 24-3, at 25–26]. At some point in the Summer of 2006, Nutter asked to speak to Blizzard in his office. *Id.* When Nutter asked her to have a seat, she refused, saying she preferred to stand. Blizzard states that Nutter was angry and hateful during the discussion about her use of the electronic calendar. Blizzard promised to pay better attention to her electronic calendar in the future.

Part of Blizzard's job in the business office was to work the cashier window from 11:30 a.m. to 12:30 p.m. during MacNail's lunch break. Nutter and MacNail allege that Blizzard was frequently absent or late. Blizzard contends that she was never late unless her duties required her to be at the loading dock during that time.

According to MacNail, Blizzard set up deferred payment plans improperly. Nutter testified that Blizzard frequently made mistakes keying in purchase requisitions, and that he needed to correct the mistakes and explain the problem to her two to four times per week.

In April, 2008, Nutter gave Blizzard permission to attend a meeting scheduled from 11:30 a.m. to 4:30 p.m. When the meeting ended twenty minutes early, Blizzard remained absent

7

from the office until 4:30 p.m. Blizzard states that several people stopped to ask her questions on her way back to the office.

On another day in April, Blizzard left early without informing Nutter. *See* [Doc. 66-1, at 31].

### 6. Age-Related Comments at MTC

In the Fall of 2006, Blizzard heard Nutter state that "most of the people here are old like you." [Doc. 24-3, at 46]. Blizzard mentioned the remark to Hauenstein when she saw him by the vending machines. Parker remembers Blizzard mentioning that Nutter referred to the staff that had been in the office before his employment as "old-timers." [Doc. 33, at 26–27]. Parker interpreted the remark as referring to the way the staff "had performed tasks prior to [Nutter's] being in the office." *Id.*

Blizzard overheard Nutter laughing at Joe Liles, another supervisor at MTC, calling him stupid and stating that he had been in his job too long. [Doc. 24-2, at 176]. Liles is about the same age as Blizzard. *Id.* Blizzard also overheard Nutter comment that Boyer was "lazy and didn't work and wasn't doing his job and had been there too long." *Id.* at 177.

Once, when Blizzard was in the registrar's office, Registrar Wendy Wiseman, after talking about her own plans for retirement, asked Blizzard how long she had until retirement. Blizzard testified in deposition, "I determined that to be an age-related question." [Doc. 24-3, at 3].

On another occasion at the registrar's office, Blizzard overheard Kristy Brawley ask Vicky Weaver, "[W]hy would you want to hire someone who has only three or four years left until retirement?" This was shortly after Blizzard applied for an administrative and financial area secretary job at MTC in 2006. Blizzard understood them to be talking about hiring for the registrar's

8

job. Blizzard does not know if either Brawley or Weaver had any role in hiring for either of these positions.

Weaver also considered applying for other jobs at MTC, and in a conversation with Blizzard about job applications, asked Blizzard what she was going to do after retirement.

While at MTC, Blizzard often overheard Boyer talking about "the old geezer club." Blizzard understood Boyer to mean himself, Hauenstein, Nutter and Gene Tolliver, who worked in facilities. Parker referred to this group as a "good old boys club" once when Blizzard came to complain about Nutter's management of the business office.

Blizzard complained twice to Parker about being discriminated against because of her age. [Doc. 24-3, at 21]. Blizzard never explicitly stated that she felt she was being discriminated against because of her age, but rather felt that she implied it when she explained that she was being expected to work longer hours and Thomas was not working additional hours or giving her help. [Doc. 24-3, at 21–22].

Blizzard believes she specifically mentioned age discrimination to Linda King. [Doc. 24-3, at 22]. King remembers Blizzard using the term "harassed" in her email, but felt that Blizzard was not actually being harassed based on her own observation of Blizzard and Nutter's interactions. [Doc. 31-1, at 1–2]. Blizzard remembers talking to King about filing a grievance, and states that King warned her that it would only make things worse. King does not recall the conversation.

Blizzard also spoke to Diane Rodman, chair of the support staff group, about "what was going on in the office," and Rodman recommended she talk to Parker. [Doc. 24-3, at 23].

9

**7. Blizzard's Termination**

A week or two before Blizzard's dismissal, Hauenstein and Nutter met with Boyer to discuss firing Blizzard. Boyer accepted Nutter's recommendation, and tasked Hauenstein with ensuring that MTC provided a sufficient basis for the dismissal. Nutter drafted a memorandum titled, "Conduct of Peggy Blizzard," which he gave to Hauenstein and Boyer on April 21, 2008. Neither Boyer nor Hauenstein conducted any independent investigation.

On April 22, 2008, Hauenstein handed Blizzard a letter informing her that a pre-disciplinary hearing had been scheduled that afternoon. He also advised her that, because termination of her employment would be considered, she had the right to have a witness or representative with her. Diana Rodman and Vickie Axline, support staff co-chairs, attended the meeting with Blizzard. The meeting was in Boyer's office. Nutter and Hauenstein also attended.

Hauenstein told Blizzard she was being dismissed. He explained that she had failed to take opportunities to learn and made uncorrected errors. He stated that she had been given the chance to improve and had not done so.

Hauenstein allowed Blizzard to ask questions, but it was clear that the decision had been made. Hauenstein asked Blizzard to collect her personal items from her work area and leave the college. As she walked out of Boyer's office, he handed her a memorandum stating in brief the reasons for her termination and giving details about her final paycheck.

Rodman and Axline were shocked. They both explained that MTC does not generally fire employees. Axline stated, "That's the first time I think anybody has been let go." [Doc. 35, at 29]. King found the termination "vicious," because Blizzard received such short notice and had to clear out her desk while employees were still at the office. [Doc. 31, at 36–37]. She did not, however, believe that there was any intention to embarrass Blizzard. *Id.*

11

Immediately after Blizzard's dismissal, Thomas assumed Blizzard's responsibilities in addition to her own. During the Summer of 2008, MTC discussed reorganizing the business office to improve customer service and realign job descriptions to better match the new computer system. In August, 2008, the business office added a cashier position, hiring twenty-nine-year-old Kristina Walters.

In November, 2008, MTC hired fifty-five-year-old Janice Teeter through a temporary employment staffing agency to perform the Accounts Payable Clerk duties. Teeter worked as a temporary employee until July 20, 2009, when MTC hired her on full-time.

On June 30, 2008, Blizzard filed a charges of retaliation and age and sex discrimination with the EEOC. This litigation followed.

### Standard of Review

A party is entitled to summary judgment on motion under Fed. R. Civ. P. 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 322 (1986). The movant must initially show the absence of a genuine issue of material fact. *Id.* at 323.

Once the movant meets that initial burden, the "burden shifts to the nonmoving party [to] set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex*, *supra*, 477 U.S. at 324.

In deciding a motion for summary judgment, I accept the opponent's evidence as true and construe all evidence in the opponent's favor. *Eastman Kodak Co. v. Image Tech. Servs., Inc*., 504

U.S. 451, 456 (1992). The movant can prevail only if the materials offered in support of the motion show there is no genuine issue of a material fact. *Celotex*, *supra*, 477 U.S. at 323.

## Discussion

### A. Age Discrimination Claims

The ADEA prohibits an employer from failing or refusing to hire, discharging, or discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age . . . ." 29 U.S.C. § 623(a)(1). A plaintiff may establish a violation of the ADEA by either direct or circumstantial evidence.

"Direct evidence of discrimination is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc). Circumstantial evidence does not prove discriminatory animus but rather allows a fact-finder "to draw a reasonable inference that discrimination occurred." *Id.*

Regardless of whether the plaintiff relies on direct or circumstantial evidence, the plaintiff has the burden of demonstrating "that age was the 'but-for' cause of [the] employer's adverse action." *Gross v. FBL Financial Services, Inc.*,   U.S.   , 129 S. Ct. 2343, 2351 n. 4 (2009).

### 1. Direct Evidence

Although Blizzard lists several incidents of "age-related" comments she felt to be discriminatory in her complaint and in her deposition, Blizzard does not assert that she has direct evidence of age discrimination. *See* [Doc. 66, at 36–37].

### 2. Circumstantial Evidence

13

The Sixth Circuit applies *McDonnell Douglas* burden-shifting framework to analyze ADEA claims based on circumstantial evidence. *Geiger v. Tower Automotive*, 579 F.3d 614, 622 (6th Cir. 2009).

Under the *McDonnell Douglas* framework, "if an employee establishes a *prima facie* case, an inference of discrimination arises. The burden of production then shifts to the employer, which must articulate a non-discriminatory reason for taking an adverse employment action against the employee." *Sutherland v. Mich Dep't of Treasury*, 344 F.3d 603, 615 (6th Cir. 2003) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). If the employer provides such a reason, the employee bears the burden of showing that the non-discriminatory reason is pretextual—that is, the reason has no basis in fact, the reason did not actually motivate the adverse employment action, or the reason was insufficient to motivate such action. *Id.*

The Ohio Supreme Court has held that the elements and burdens of proof in a state age discrimination claim are the same as in a federal case. *Baker v. Scovill, Inc.*, 6 Ohio St. 3d 146, 146 (1983). Thus, I apply the same analytical framework to Blizzard's age discrimination claim under ORC § 4112 as to her claims under the ADEA.

### a. *Prima Facie* Case

To set forth a *prima facie* case of age discrimination, Blizzard must show that: 1) she was a member of a protected class; 2) she suffered an adverse employment action; 3) she was qualified for the position held; and 4) she was replaced by someone significantly younger or treated differently than significantly younger employees. *E.g.*, *Geiger*, *supra*, 579 F.3d at 622; *see O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 313 (1996) ("Because the ADEA prohibits discrimination on the basis of age and not class membership, the fact that a replacement

14

is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class.").

Both sides agree that Blizzard is a member of a protected class under the ADEA.

### i. Adverse Employment Action

MTC admits that Blizzard suffered an adverse employment action when she was fired in April, 2008. Blizzard alleges that several other incidents also constitute adverse employment actions, including the negative appraisal she received in June, 2006, the longer work hours she put in during training and from December 17–20, 2007, the lack of assistance she received at work and the emotional abuse to which Nutter subjected her.

An adverse employment action is an action that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Industries v. Ellerth*, 524 U.S. 742, 761 (1998). I agree with MTC that only the termination of Blizzard's employment is an adverse employment action.

The 2006 appraisal does not constitute an adverse employment action. In general, "a negative performance evaluation does not constitute an adverse employment action unless the evaluation has an adverse impact on an employee's wages or salary." *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 322 (6th Cir. 2007). Blizzard continued to receive regular pay increases following the negative evaluation up until her termination.

Blizzard argues that because MTC relied on the 2006 appraisal in explaining its basis for discharging her two years later, the 2006 appraisal had a negative impact on her later employment status. This fact does not, of itself, make the 2006 appraisal a distinct adverse employment action.

15

Plaintiff's reliance on *White v. Baxter Healthcare Corp.*, 533 F.3d 381 (6th Cir. 2008), to support this argument is misplaced. The Sixth Circuit in *White* found the negative appraisal to be an adverse employment action because White "receiv[ed] a lower salary increase than he would have without the more negative evaluation." *Id.* at 403.

As for the other alleged adverse employment actions, Blizzard argues that "taken together, [they] are sufficient to establish an adverse employment action." [Doc. 66, at 38]. None of these actions constitutes a significant change in benefits. Blizzard's termination is therefore the only adverse employment action I shall consider.

### ii. Qualified for Position

In order to show that she is qualified, Blizzard "must prove that [she] was performing [her] job at a level which met [her] employer's legitimate expectations." *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 372 (6th Cir. 1999) (quoting *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir. 1990). The parties did not address this element, but rather discuss Blizzard's abilities in determining whether MTC's reasons for terminating her employment were pretextual. I will therefore assume that Blizzard has at least demonstrated an issue of fact as to her qualifications.

### iii. Replaced by Someone Significantly Younger

Blizzard asserts that she was replaced by Thomas, who took over the majority of Blizzard's job duties in addition to her own at the time of Blizzard's dismissal.

MTC states that the business office distributed Blizzard's duties among the remaining employees until November 2008, when it hired Janice Teeter as Accounts Payable Clerk on a temporary basis before offering her permanent employment in 2009. Evidence suggests that Thomas performed the majority of Blizzard's duties until November, 2008.

16

Thomas' initial assumption of Blizzard's duties does not constitute replacement. A "person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform plaintiff's duties." *Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir. 2003) (quoting *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990)); *see also Lilley v. BTM Corp.*, 958 F.2d 746, 752 (6th Cir. 1992) ("Spreading the former duties of a terminated employee among the remaining employees does not constitute replacement."); *Godfredson v. Hess & Clark*, 173 F.3d 365, 373 (6th Cir. 1999) (finding that where existing employees assumed plaintiff's duties in addition to their other duties, and maintained their prior job titles and responsibilities, plaintiff had not been replaced).

Blizzard also claims that twenty-nine-year-old Kristina Walters, hired in August 2008, replaced her because Walters performed a significant portion of Blizzard's job duties. Walters did not replace Blizzard. Although Blizzard did work at the cashier desk during MacNail's lunch break and, at times, from 5 p.m. to 6 p.m., the record is clear that this work did not make up a substantial portion of Blizzard's duties. Walters' position relieved all the business office employees of the duty of working the window. MTC gave Teeter the same job title, Accounts Payable Clerk, that Blizzard had formerly held, along with all its attendant duties except working the cashier window. Teeter is the obvious replacement, and Blizzard has not shown any reason why it is appropriate I look elsewhere.

Blizzard argues that even if I conclude that Teeter replaced Blizzard, Blizzard has made a *prima facie* case as Teeter is six-and-a-half years younger than Blizzard.  "[T]he *prima facie* case

requires evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion. In the age-discrimination context, such an inference cannot be drawn from the replacement of one worker with another worker insignificantly younger." *O'Connor*, *supra*, 517 U.S. at 312–13.

In *Grosjean*, *supra*, 349 F.3d at 336–40, the Sixth Circuit addressed the question of what age difference could be considered significant. The court observed that "[a]ge differences of ten or more years have generally been held to be sufficiently substantial to meet the requirement of the fourth part of the age discrimination *prima facie* case," and that "the overwhelming body of cases in most circuits has held that age differences of less than ten years are not significant enough to make out the fourth part of the age discrimination *prima facie* case." *Id.* at 336–38 (internal citations omitted) (collecting cases).

The court in *Grosjean* observed one Sixth Circuit case that established the precedent that eight years may be significant for the purposes of meeting the fourth requirement of the *prima facie* case. *Id.* at 339. To respect its own precedent while providing guidance to lower courts, the court therefore held that "in the absence of direct evidence that the employer considered age to be significant, an age difference of six years or less between an employee and a replacement is not significant." *Id.* at 340.

Although an age difference of six and a half years is perhaps not the best evidence to create an inference of age discrimination, other district courts have found it sufficient to create an issue of material fact as to whether age discrimination motivated an adverse employment action. *E.g.*, *Gross v. Illinois Tool Works, Inc.*, 2008 WL 4070272, *10 (S.D. Ohio 2008); *Evanoff v. Banner Mattress*

18

*Co.*, 2008 WL 4683300, *13 (N.D. Ohio 2008) ("[A] replacement who is seven years younger could qualify as a replacement of 'substantially younger age.'").

Blizzard therefore can establish a *prima facie* case of age discrimination.

### b. Pretext

Although Blizzard can make out a *prima facie* case, MTC articulated legitimate, nondiscriminatory business reasons for dismissing Blizzard.  According to her supervisor, Blizzard failed to follow proper procedures in using the new software systems, which resulted in unmanageable vendor lists, duplicate payments to vendors and errors in processing accounts payable receipts. She was unaccountably absent from her work area, she failed to perform necessary functions of her job and exhibited a general unwillingness to cooperate with other employees in the business office or to attend meetings and training on the new software systems. She resisted changes to what she perceived to be the duties of the Accounts Payable Clerk job.

To establish that these reasons are pretext for discrimination, Blizzard must present evidence sufficient to enable a jury to find that MTC's explanation for the adverse action: 1) has no basis in fact; 2) did not actually motivate the adverse action; or 3) was insufficient to warrant the action. *Ladd v. Grand Trunk Western R.R.*, 552 F.3d 495, 502 (6th Cir. 2009).

The Sixth Circuit has held that "the reasonableness of an employer's decision may be considered to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003); *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998) (holding that, in evaluating a proffered nondiscriminatory basis for an employment action, courts should inquire into "whether the employer made a reasonably informed and considered decision before

19

taking an adverse employment action"); *see also Texas Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248, 259 (1981) ("The fact that a court may think the employer misjudged the qualifications of the applicants does not in itself expose him to Title VII liability, although this may be probative of whether the employer's reasons are pretexts for discrimination.).

Blizzard argues that Thomas made similar, if not more egregious, errors at work. Blizzard states that Thomas socialized frequently and was unaccountably absent for hours at a time, yet MTC fired Blizzard while Thomas received no formal reprimand. Blizzard complains that MTC undertook no independent investigation of Nutter's representations before terminating her employment.

The reasons MTC gives for Blizzard's termination have a basis in fact, and while Blizzard may feel them to be unfair, they are not unreasonable. Thomas and Blizzard did not make the same mistakes at work, and Blizzard has not provided any evidence that Thomas struggled with the new software. Blizzard has presented no evidence that she properly learned the new software—plaintiff's brief cites Joy Moore's testimony that she was "hesitant" and "slower" to learn the software. This fact combined with Blizzard's absences and perceived attitude provide reasonable, non-discriminatory reasons for her termination.  Neither the latitude shown Thomas' socializing nor Blizzard's replacement seven months later by a woman six-and-a-half years younger show these reasons to be pretextual.

Blizzard argues that Nutter's "adverse comments and conduct regarding older employees is further evidence of pretext. It illustrates his true motivations." [Doc. 66, at 40]. Blizzard states that Nutter once said to her that "most of the people here are old like you." [Doc. 24-3, at 46]. Blizzard overheard Nutter laughing at Joe Liles, a supervisor at MTC approximately Blizzard's age, calling him stupid and stating that he had been in his job too long. [Doc. 24-2, at 176]. Blizzard also

overheard Nutter comment that Boyer was "lazy and didn't work and wasn't doing his job and had been there too long." *Id.* at 177. These comments were neither pointed nor commonplace. They were interpreted by other staff as referring not to age but to tenure. [Doc. 33, at 26–27]. They do not suffice to meet her burden of showing the reasons for her firing were pretextual, rather than the true reasons.

The record is clear that Nutter and Blizzard did not work well together. But even if their personal relationship influenced his decision, "discrimination based on personal animus, as opposed to age-based animus, is not illegal under the ADEA." *Pollitt v. Roadway Exp., Inc.*, 228 F. Supp. 2d 854, 871–72 (S.D. Ohio 2002). *See Diamond v. U.S. Postal Serv.*, 2002 WL 21995, * 4 n. 5 (6th Cir. 2002) (declining to find discrimination based on sex in light of personal animus that existed against a plaintiff).

The plaintiff's burden at the second stage of the *McDonnell Douglas* analysis is to show "both that the reason was false, and that discrimination was the real reason." *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 473 (6th Cir. 2002) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993)).

Blizzard has not carried her burden of showing that age was a "but-for" cause of her termination, and therefore I must grant summary judgment to defendants on her age discrimination claims.

## B. Retaliation

The conventional *McDonnell Douglas* analytical and evidentiary framework applies to retaliation claims based on circumstantial evidence. *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008). This is true for claims arising under both the ADEA and ORC § 4112.02. *Id.*

Under this test, Blizzard must first establish a *prima facie* case of retaliation by demonstrating that: 1) she engaged in a protected activity; 2) the employer knew that she exercised her protected civil rights; 3) the employer thereafter discriminated against her in a materially adverse way; and 4) there was a causal connection between the protected activity and the adverse action. *E.g.*, *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 588 (6th Cir. 2009).

Under Ohio law, "to engage in a protected opposition activity . . . a plaintiff must make an overt stand against suspected illegal discriminatory action." *Lockett v. Marsh USA, Inc.*, 2009 WL 4412326, *12 (6th Cir. 2009) (unpublished disposition) (quoting *Coch v. Gem Indus., Inc.*, 2005 WL 1414454, *5 (Ohio Ct. App. 2005)). Similarly, under the ADEA, "a plaintiff's expression of opposition must concern a violation of the ADEA." *Fox v. Eagle Distributing Co., Inc.*, 510 F.3d 587, 591 (6th Cir. 2007).

Blizzard lists a number of occasions on which, according to her, she engaged in protected activity. These include her May 25, 2006 email and complaints about Nutter to King, Parker, and Hauenstein.

The May 25, 2006 email does not constitute protected activity. The email complains about her hours and the fact that she was "being treated like [she is] a full-time employee and unfairly." [Doc. 41-17]. She also complained that Nutter reprimanded her for scheduling a medical test during a one-hour meeting and lamented, "Others in this office has not been required to work extra hours so why am I being picked on and then harassed?" *Id.* The email does not state that Blizzard feels she is being subject to age discrimination, or even that she is being treated differently than younger employees.

22

A vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition to an unlawful employment practice. *Fox*, *supra*, 510 F.3d at 591 (quoting *Booker v. Brown & Williams Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989)); *see also Willoughby v. Allstate Ins. Co.*, 104 Fed. Appx. 528, 531 (6th Cir. 2004) (unpublished disposition) (rejecting claim that letter sent preceding retaliation constituted protected activity where letter made vague references to unhappiness among Caucasian employees); *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 701–02 (3d Cir. 1995) (holding that plaintiff's letter to Human Resources complaining about unfair treatment in general was not protected activity under the ADEA because letter did not specifically complain about age discrimination).

Blizzard's complaints to Parker, Hauenstein and King likewise do not constitute protected activity.

When Blizzard met with Hauenstein after the May 25, 2006, email, she complained about Nutter's behavior and her schedule. She did not, however, claim he was illegally discriminating against her. Blizzard claims that she told Hauenstein about Nutter's remark that "most of the people here are the old people like you." Even if this casual conversation could be considered a protected activity, there is no evidence that Hauenstein understood her to be reporting discrimination, and no evidence that her comment led to any adverse action against her.

Blizzard frequently complained to Parker about Nutter and his management of the business office. Blizzard asserts that she complained that Thomas, her youngest colleague, was not working additional hours or giving her help. Blizzard admits that she never described the situation as age discrimination, but explains that she implied that in conversation. [Doc. 24-3, at 22]. "An employee may not invoke the protections of the Act by making a vague charge of discrimination." *Fox*, *supra*,

510 F.3d at 591 (quoting *Booker v. Brown & Williams Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989)).

Blizzard testified she told King that she was being discriminated against because of her age. [Doc. 24-3, at 22]. Blizzard also testified King warned her that filing a grievance "will make things much worse for you." [Doc. 24-5, at 22]. While this complaint does constitute protected activity, Blizzard has not shown neither that Nutter or any other decision-maker was aware of Blizzard's conversation with King nor a causal connection between this complaint an ensuing adverse action.

A jury could find that she and Nutter had an unpleasant employee-supervisor relationship and they were mutually dissatisfied with each other. But personality conflicts do not give rise to claims of unlawful retaliation. *See*, *e.g.*, *Burlington Northern and Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006); *Thibert v. City of Oregon*, 724 F. Supp. 2d 830, 837 (N.D. Ohio 2010); *Giannini-Baur v. Schwab Retirement Plan Servs.*, 2010 WL 5548784, *3 (Ohio Ct. App.).

The record here, though reflecting a long period of mutual discontent, fails to show age-based or unlawful retaliatory animus on Nutter's part.

Blizzard has not established a *prima facie* case of retaliation, and therefore summary judgment for defendants is appropriate on these claims.

### C. Intentional Infliction of Emotional Distress

A claim of intentional infliction of emotional distress has four elements: 1) defendants intended to cause emotional distress, or knew or should have known that their actions would result in plaintiff's serious emotional distress; 2) defendants' conduct was extreme and outrageous; 3) defendants' actions proximately caused plaintiff's emotional injury; and 4) plaintiff suffered serious emotional anguish. *Hanly v. Riverside Methodist Hosp.*, 78 Ohio App. 3d 73, 82 (1991).

The Ohio Supreme Court recognizes liability for intentional infliction of emotional distress "where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Yaeger v. Local Union 20*, 6 Ohio St. 3d 369, 375 (1983), *abrogated on other grounds, Welling v. Weinfield*, 113 Ohio St. 3d 464 (2007).

Nothing Blizzard alleges "go[es] beyond all possible bounds of decency." *Id.* Although two employees described Blizzard's termination as "shocking," they explained that their surprise was because MTC does not generally fire employees. Axline stated, "That's the first time I think anybody has been let go." [Doc. 35, at 29]. King found the termination "vicious," because Blizzard received such short notice and had to clear out her desk while employees were still at the office. [Doc. 31, at 36–37]. She did not, however, believe that there was any intention to embarrass Blizzard. *Id.*

The Sixth Circuit, applying Ohio law, has held that "an employee's termination, even if based upon discrimination, does not rise to the level of extreme and outrageous conduct without proof of something more." *Godfredson*, *supra*, 173 F.3d at 376; *see also Tackett v. Dept. of Rehab. and Correction*, No. 2006-06604, 2008-Ohio-3410, ¶ 27 (Ct. Claims 2008) ("The act of terminating employment is not 'outrageous' conduct sufficient to form the basis of a claim of intentional infliction of emotional distress."). "Were this not the case, then 'every discrimination claim would simultaneously become a cause of action for the intentional infliction of emotional distress.'" *Dobrski v. Ford Motor Co.*, 698 F. Supp. 2d 966, 988 (N.D. Ohio 2010) (quoting *Godfredson*, *supra*, 173 F.3d at 376).

25

As noted, the record makes clear that Nutter and Blizzard did not get along. He found her work less than satisfactory; she found him to be a disagreeable supervisor. She felt he treated her unfairly.

But, as with claims of age-based retaliation, adverse employment decisions arising from personality conflicts of the sort manifest in this record do not give rise under Ohio law to actionable claims for intentional infliction of emotional distress. *Simpkins v. Specialty Envelope, Inc*. 94 F.3d 645, 1996 WL 452858, *8 (6th Cir.) (unpublished disposition) (applying Ohio law).

Blizzard cannot maintain her claim of intentional infliction of emotional distress.

### D. Breach of Public Policy Claim

Blizzard asserts in her complaint that MTC violated its anti-discrimination policy and its termination policy. Blizzard has presented no evidence to prove she had a contract that could be breached by MTC. Absent such evidence, Blizzard's breach of public policy or contract claim must fail. *Lott v. Oriana House, Inc.*, 2008 WL 3889983, *5 (N.D. Ohio), *aff'd*, 340 Fed. App'x 305 (6th Cir. 2009) (unpublished disposition).

### Conclusion

For the foregoing reasons, it is hereby:

ORDERED THAT defendants' motion for summary judgment [Doc. 42] be, and the same hereby is granted.

So ordered.

/s/James G. Carr
Sr. United States District Judge

26